UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

InSync Training, LLC

      v.                               Civil No. 21-cv-594-JL
                                           Opinion No. 2022 DNH 055

American Society for Training and
Development, Inc.

**<u>MEMORANDUM ORDER</u>**

      This copyright and contract-based action requires a determination of whether the plaintiff has plead sufficient nonconclusory and nonspeculative facts supporting its claims.  The plaintiff, InSync Training, LLC, develops and delivers virtual and online training courses and materials focused on effective virtual learning techniques, and the defendant, American Society for Training and Development, Inc., provides professional development training, with a focus (prior to 2020) on in-person offerings.  In October 2020, ATD entered into a License Agreement with InSync, under which ATD gained access to some of InSync's course materials and obtained training on how to deliver InSync's courses.  Under the License Agreement, ATD was permitted to use InSync's materials to deliver courses directly to customers, but not to generate ATD's own competitive offerings.

      ATD terminated the License Agreement effective June 30, 2021, roughly eight months after entering into the agreement, and then began offering competing courses on its website the next day.  InSync obtained copyright registration for its course materials on June 30, 2021, and about a week later filed suit against ATD, alleging that ATD copied InSync's protected course materials when developing its competing offerings, thereby violating the License Agreement and

the Copyright Act; induced InSync to enter into the License Agreement by fraudulently representing that it had no intention to copy InSync's course materials; and maintained access to InSync's course materials under the License Agreement by continuing this misrepresentation. InSync asserts four claims against ATD: copyright infringement (Count 1); unfair competition under the New Hampshire Consumer Protection Act, RSA § 358-A (Count 2); breach of contract (Count 3); and fraud (Count 4).

Shortly after InSync filed its complaint, ATD produced its competing course materials to InSync, and InSync then moved to amend its complaint to add details gathered from the documents.  Now, ATD objects to the motion to amend as to each of the four claims on futility grounds.

The court has subject-matter jurisdiction under 28 U.S.C. §§ 1331(1) (federal question), 1338(a) (copyright), and 1367(a) (supplemental jurisdiction).  After reviewing the parties' submissions and holding oral argument, the court grants the motion in part and denies it in part. The court grants the motion to amend as to the copyright infringement, unfair competition, and breach of contract claims, after finding that InSync pleads facts to support these claims, but it denies the motion as to the fraudulent misrepresentation claim because InSync's amended complaint fails to adequately plead scienter.

## I.    Applicable legal standard

"Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted."  Rife v. One W. Bank, F.S.B., 873 F.3d 17, 21 (1st Cir. 2017) (quoting Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996)).  "In reviewing for futility, the district court applies the same standard of legal sufficiency as applies to a [Federal] Rule [of Civil Procedure] 12(b)(6) motion."  Glassman, 90 F.3d at 623 (internal quotation omitted).  To

survive a Rule 12(b)(6) motion, "[a] pleading . . . must contain," among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to satisfy this requirement, a plaintiff must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015) (internal quotation omitted).

Further, applying the Rule 12(b)(6) standard, the court must "take the complaint's well-pleaded facts as true," and "draw all reasonable inferences in the plaintiffs' favor." Barchock v. CVS Health Corp., 886 F.3d 43, 48 (1st Cir. 2018). "Well-pleaded facts must be 'non-conclusory' and 'nonspeculative.'" Id. (quoting Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal," or, in this case, the motion to amend should be denied as futile. Id. (internal quotation omitted).

## II. **Background**

The court gathers the following facts from the complaint and from information contained in the documents on which the complaint relies and which are central to the plaintiff's claims. See Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (in determining the sufficiency of the complaint under Rule 12(b)(6), the court may consider "documents central to plaintiffs' claim [and] . . . documents sufficiently referred to in the complaint" (internal quotation omitted)).[1]

---

[1] In addition to the complaint and documents attached to it, the court also considered excerpts from InSync and ATD's course materials that ATD attached to its objection to InSync's motion to amend. These excerpts include language that InSync quoted in its complaint as examples of copying in support of its copyright infringement claim. The court considered these excerpts for two reasons. First, they are "central" to InSync's claims and "sufficiently referred to in the complaint," as they are portions of the allegedly copied and allegedly infringing course

InSync is a New Hampshire LLC that develops and delivers "virtual and online training course materials centered on effective virtual learning techniques."[2]  ATD is a Wisconsin non-profit corporation with a place of business in Alexandria, Virginia.  ATD provides professional development services, and prior to 2020, ATD was "focus[ed] . . . on in-person professional development offerings and large, in-person conventions."[3]

On October 19, 2020, ATD entered into a "Training and Intellectual Property License Agreement" with InSync, which InSync included as an attachment to its complaint.  Under the License Agreement, ATD agreed to pay a licensing fee in order to have the right to deliver certain of InSync's programs directly to customers.[4]  As part of this arrangement, InSync agreed to instruct ATD personnel on the delivery of InSync's training programs, and InSync developed course materials for ATD--a 2020 Designing Virtual Training ATD Facilitator Guide, a 2020 ATD:  Facilitating Virtual Training Guide, and "supporting materials for th[e] two guides" (collectively, "Course Materials").[5]  The Course Materials were the product of years of "develop[ment] and fine-tun[ing] and are based on extensive industry research and best practices developed by InSync."[6]  ATD gained access to the Course Materials in October 2020, upon

materials.  See Curran, 509 F.3d at 44.  Second, InSync confirmed during oral argument that it did not object to the court's consideration of the excerpts, nor did it move to strike the excerpts.

[2] Pl.'s Amended Compl. (doc. no 24-1) at 1.

[3] Id. at ¶¶ 10-11.

[4] See Training and Intellectual Property License Agreement ("License Agreement") (doc. no. 24-3) at § 1.1.

[5] Pl.'s Amended Compl. (doc. no 24-1) at ¶¶ 15-16.

[6] Id. at ¶ 28.

execution of the License Agreement, and InSync trained ATD personnel from October 2020 until February 2021.

The License Agreement provides that ATD can "use [InSync's] Intellectual Property"--defined as "copyrights, trademarks, patents, trade secrets, know-how and other rights in and to" InSync's programs--"only in connection [with ATD's] delivery of the InSync Program Content to consumers via Authorized Trainers."[7]  Further, the License Agreement prohibits ATD from "us[ing] or rely[ing] upon the Intellectual Property in order to[,]" at any time, "directly or indirectly develop, deliver, market[,] or offer any service that is similar to or which competes with the InSync Programs."[8]

On March 29, 2021, ATD told InSync that it planned to terminate the License Agreement effective June 30, 2021.  That day, ATD also informed InSync that it "planned to offer its own competitive virtual and online training programs following termination of the License Agreement."[9]  InSync alleges that "the primary authors of the materials underpinning ATD's competitive offerings" are the same ATD personnel who InSync trained under the License Agreement.[10]

InSync acquired copyright registration for its Course Materials, effective June 30, 2021, and ATD began offering its competitive courses on its website the next day, on July 1, 2021. ATD's competing offerings include "the materials ATD produced for" a Virtual Instructional Design Certificate Program, a Virtual Training and Facilitation Certificate, and "Micro Courses"

---

[7] Id. at ¶¶ 18-19 (quoting License Agreement (doc. no. 24-3) at §§ 1.1, 1.4).

[8] Id. at ¶ 20 (quoting License Agreement (doc. no. 24-3) at § 1.4).

[9] Id. at ¶ 23.

[10] Id. at ¶ 34.

entitled, for example, Compelling Virtual Presentations, Creating Visuals for Virtual Presentations, Delivering Virtual Presentations, Designing and Developing for the Online Classroom, and more.[11]

ATD "provided assurances" to InSync that its new "virtual and online programs . . . were not based on the Course Materials[,]" but, according to InSync, ATD's offerings "are not the sort of content that a company could create from scratch in less than a year."[12]  InSync further alleges that "portions of ATD's materials bear probative and substantial similarity to InSync's Course Materials through the nearly identical expression of prompts and directives to course facilitators and producers."[13]  As support, InSync attaches to its complaint a two-page chart with a side-by-side comparison of six excerpts from the InSync and ATD Facilitator Guides, and InSync includes within its complaint a comparison of the course descriptions for InSync's Virtual Classroom Design Fundamentals course and ATD's Designing Content for Virtual Training course.  These are described in more detail <u>infra</u> Section III.A.

## III.   <u>Analysis</u>

### A.  Copyright infringement (Count 1)

 "To establish copyright infringement, a plaintiff must prove '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  <u>Lotus Dev. Corp. v. Borland Int'l, Inc.</u>, 49 F.3d 807, 813 (1st Cir. 1995), <u>aff'd</u>, 516 U.S. 233 (1996) (quoting <u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991)).  ATD's argument

---

[11] <u>Id.</u> at ¶ 30.

[12] <u>Id.</u> at ¶¶ 24, 29.

[13] <u>Id.</u> at ¶ 27.

centers on the second element of the copyright infringement claim, which consists of two parts:

actual copying and substantial similarity.[14]  More specifically, to satisfy the second element, the

plaintiff:

> must first prove that the alleged infringer copied plaintiff's copyrighted work as a factual
> matter; to do this, he or she may either present direct evidence of factual copying or, if
> that is unavailable, evidence that the alleged infringer had access to the copyrighted work
> and that the offending and copyrighted works are so similar that the court may infer that
> there was factual copying (i.e., probative similarity).  The plaintiff must then prove that
> the copying of copyrighted material was so extensive that it rendered the offending and
> copyrighted works substantially similar.

Id. (internal citations omitted).  "Substantial similarity is measured by the ordinary observer

test"; under this test, "two works will be said to be substantially similar if a reasonable, ordinary

observer, upon examination of the two works, would conclude that the defendant unlawfully

appropriated the plaintiff's protectable expression." Hassett v. Hasselbeck, 757 F. Supp. 2d 73,

79-80 (D. Mass. 2010) (internal quotation omitted).

Importantly, "the resemblances relied upon as a basis for finding probative" and

substantive similarity "must refer to constituent elements of the copyrighted work that are

original." Greenspan v. Random House, Inc., 859 F. Supp. 2d 206, 214 (D. Mass. 2012)

(internal quotation omitted), aff'd sub nom. No. 12-1594, 2012 WL 5188792 (1st Cir. 2012);

accord Johnson v. Gordon, 409 F.3d 12, 18 (1st Cir. 2005) (noting, in reference to the probative

and substantial similarity elements, that "[t]he requirement of originality cuts across both of

---

[14] As for the first element, ownership of a valid copyright, InSync alleges in its complaint that it
obtained copyright registration for its Course Materials effective June 30, 2021, and it provides
the registration number.  See Amended Compl. (doc. no. 24-1) at ¶ 27.  InSync also attaches to
its complaint a printout of an entry from the United States Patent Office's online catalogue
indicating that "2020 Designing Virtual Training ATD Facilitator Guide and 5 Other
Unpublished Works" were registered as of June 30, 2021.  See doc. no. 24-5 at 2.  Further,
during oral argument, InSync confirmed that the bulk of its Course Materials, aside from some
handouts and other items, are covered by the copyright registration.  With this, InSync more than
adequately pleads copyright ownership with respect to the Course Materials.

these similarity criteria").  "Thus, in examining whether actual copying has occurred, a court must engage in dissection of the copyrighted work by separating its original, protected expressive elements from those aspects that are not copyrightable because they represent unprotected ideas or unoriginal expressions."  Greenspan, 859 F. Supp. 2d at 214 (quoting Johnson, 409 F.3d at 19).

To begin, InSync adequately alleges that ATD had access to the Course Materials under the License Agreement.  The court's analysis, then, turns on the similarity between ATD's course materials, on one hand, and the original portions of InSync's Course Materials, on the other.  To demonstrate similarity, InSync compares the descriptions of one InSync course and one ATD Micro Course.  InSync also attaches to its complaint a chart ("Comparison Chart") with side-by-side comparisons of six excerpts of the parties' Facilitator Guides; InSync describes this as an "illustrative comparison of InSync and ATD course excerpts."[15]  The court discusses each of InSync's examples of similarity below and finds that a portion of them support an inference that the Course Materials and ATD's competing offerings exhibit probative and substantial similarities.

*Course descriptions.*  According to InSync, the publicly available course description for ATD's Micro Course entitled Designing Content for Virtual Training "suggests" that the course contains "actual or derivative copies of InSync's" course entitled Virtual Classroom Design Fundamentals:  One-Day Immersion.[16]  Both course descriptions explain that a virtual class should be well or solidly designed for better learning.  While InSync's course description names lesson topics, such as "moving from webinar to true learning approaches in the virtual

---

[15] Pl.'s Amended Compl. (doc. no 24-1) at ¶ 25; doc. no. 24-4.

[16] Id. at ¶¶ 32-33.

classroom" and "designing for true engagement using directed approaches to interaction and collaboration," ATD's description states that participants will "[d]iscover how to apply instructional design techniques and processes specifically to materials for a virtual classroom."[17]

Based on these descriptions, the court can reasonably infer that the courses cover similar subject matter--the design of virtual classes for optimal engagement. This common focus provides some support, beyond mere speculation, for the inference that ATD's Micro Course bears similarities to, and copied from, the original content in InSync's course. This inference is strengthened when the course descriptions are considered alongside InSync's allegations that (i) ATD was focused on in-person, and not virtual, training prior to 2020, and (ii) ATD developed its course offerings quickly, within months, after obtaining access to InSync's Course Materials. See 4 Nimmer on Copyright § 13.02 (2021) ("Unusual speed in the creation of defendant's work may furnish some evidence that defendant had access to and used plaintiff's work rather than resorting to independent creation.").

ATD argues that InSync's allegations of copying with respect to the Micro Courses are conclusory because InSync does not allege that it has seen the Micro Courses. For support, ATD cites to Kenney v. Warner Bros. Ent. Inc., 984 F. Supp. 2d 9 (D. Mass. 2013). Kenney does not squarely support ATD's position, however. In Kenney, the plaintiff failed to demonstrate probative or substantial similarity between his work and the offending work of the defendant because he merely alleged that the themes, lead characters, and titles of the two works were similar. Id. at 13-14. The court concluded that "because [the plaintiff] has not seen [the defendant's] purportedly infringing screenplay or movie (there is no indication that either yet exists), there are no sustainable allegations of plagiarism." Id. at 14. The court further reasoned

---

[17] Id.

that "copyright law . . . does not protect concepts and ideas[,]" nor does it protect "stock scenes and characters" or "plots, subplots[,] or themes." Id. This conclusion and reasoning do not suggest, as ATD argues, that a plaintiff categorically cannot state a claim for copyright infringement without viewing the offending work in its entirety, or based only on a synopsis or description of the work. The court does not find support for such a proposition in the case law, nor does ATD point to any.

*Comparison Chart: Rows 1 and 4*. Moving on to InSync's Comparison Chart, Row 1 contains lists from the two guides, each of which describes four "level[s]" for evaluation. The two lists are similar in substance. The first three levels are identified using the same exact terms: reaction, learning, and behavior. InSync's guide states that the fourth level "involves analyzing the final results of your training," and ATD's guide states that the fourth level focuses on the "results" or "impact on the organization." Both guides also define each level similarly, albeit with a different selection of words.

The fourth row contains lists of adult students' qualities; once again, each list incorporates the same concepts. Both lists describe adult students as "goal-oriented." The remainder of the lists use synonymous, though not identical, terms. InSync's guide states that students "bring life experiences," and are "self-directed," and ATD's guide states that students "need to share opinions and experiences" and "set their own expectations." Finally, InSync's guide notes that students are "relevancy oriented," "practical," and "like to be respected." Similarly, ATD's guide states that students "[n]eed to be able to apply new knowledge right away," and "[n]eed to have some control" and "be active agents in their learning."

ATD argues that the material in these rows is not subject to copyright protection because it is not original; instead, it is drawn from other published works--specifically, Donald

Kirkpatrick's four levels of evaluation, and Malcolm Knowles' adult learning principles.

"Original, as the term is used in copyright, means only that the work was independently created

by the author (as opposed to copied from other works), and that it possesses at least some

minimal degree of creativity."  Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC, 560 F.3d 53,

60 (1st Cir. 2009) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991)).

ATD's critique of the excerpts' originality is unavailing at this stage because "the determination

of whether a work is sufficiently original to be protected is a factual issue that is inappropriate

for determination on a motion to dismiss."  Autodesk, Inc. v. ZWCAD Software Co., Ltd., No.

5:14-CV-01409-EJD, 2015 WL 2265479, at *4 (N.D. Cal. May 13, 2015) (internal quotation

omitted); see also Magic Mktg., Inc. v. Mailing Servs. of Pittsburgh, Inc., 634 F. Supp. 769, 771

(W.D. Pa. 1986).  ("The issue of copyrightability is typically resolved by a motion for summary

judgment" (citing cases)).

        For example, even if the court were to accept ATD's contention that Rows 1 and 4 are

recapitulations of the work of other scholars and thus not worthy of copyright protection,

InSync's decision to include these works in its guide could be considered original, as could

InSync's presentation or organization of the material on its own or in relation to other theories

and constructs presented.  See Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc., 997

F. Supp. 2d 92, 113 (D. Mass. 2014) ("the structure or arrangement of unprotected elements

sometimes reflects creative choices worthy of copyright protection.").

        ATD further asserts that Rows 1 and 4 employ common words and phrases that are not

entitled to copyright protection.  Again, the court cannot find that the words and phrases included

in the excerpts are unworthy of protection, as "[w]hether a short phrase is sufficiently original to

merit copyright protection often depends on context"—context that is lacking at this early stage

of litigation.  Id. at 112.  For example, courts have determined that words and phrases lack the originality necessary for copyright protection where they are "fragmentary," "cliched language typically used to convey" a particular idea, or "forms of expression dictated solely at functional considerations . . . ."  CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc., 97 F.3d 1504, 1519-20 (1st Cir. 1996) (internal quotations omitted).  ATD's arguments do not support such a finding with respect to the words in Rows 1 and 4, at this juncture.

   *Rows 2, 3, 5 and 6.*  These rows each contain prompts for the instructors to follow while delivering a course.  The rows are replicated below, along with InSync's highlighting, signifying the portions that InSync considers similar.

| Row | InSync Facilitator Guide | ATD Facilitator Guide |
|---|---|---|
| 2 | **ASK**<br><br>What should you include in the learners' participant guide to help them with the activity? Answer in chat. | **ASK**<br>Think about the participant materials made available to you in this course. What has been most helpful to you? What do you need more or less of? Tell us in chat. |
| 3 | **Looking for:**<br>• Chat<br>• Polls<br>• Writing on whiteboard<br>• Clicking Green check/Red X<br>• Displaying emoticons (smiley face when back from break)<br>• Verbal exchanges | **KEY POINTS**<br>• Chat function: Learners can ask questions or share input.<br>• Whiteboards: Allow learners to share a screen that learners can annotate and type text on. Can be saved and shared with learners<br>• Poll: Allows anonymous collection of learner feedback. Can be used for debriefs, knowledge checks, quizzes, or quick engagement |

| 5 | **Warmup Prompt:** <br><br> What do you imagine will be your biggest challenge teaching in the virtual classroom? <br><br> **DO** <br><br> • Comment appropriately on what participants have written and relate it to what will be covered throughout this course. | **SAY** <br><br> Let's pause for a moment and get to know each other. I would like everyone to claim a box on the whiteboard and answer the question on the screen: What is your biggest challenge when facilitating virtually? <br><br> **DO** <br><br> Comment appropriately and summarize the group's experience. |
|---|---|---|
| 6 | **SAY** <br><br> Claim a space on the whiteboard and jot down one or two skills that you think an online facilitator should have. What would they need to **know**? What would they need to **do**? What types of **behaviors** would they need to exhibit? | **SAY** <br><br> Based on your own experience as a learner or facilitator, share some of the skills you think are crucial for success. Put your answer in the chat or raise your hand to come off mute. |

At the outset, the court finds that the content in Row 2 does not support an inference of similarity or actionable copying because, as ATD argues, the two excerpts are dissimilar. Row 2 presents two questions for instructors to pose to students pertaining to class materials, but the questions seem to reference differing materials and seek different information. The InSync guide asks the students to consider what information to place in the guides to help their future course participants with a particular activity, whereas the ATD guide asks the students what overall course materials they found most helpful for themselves.

Next, in Row 3, the common terms between the two guides--chat, whiteboards, and polls--are words and phrases that likely do no merit copyright protection because they are commonly used in relation to the subject matter at hand, online and virtual training or interactions.  See Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 68 (1st Cir. 2009) (noting that "[t]he doctrine of scènes à faire denies copyright protection to elements of a work that are for all practical purposes indispensable, or at least customary, in the treatment of a given subject matter" (internal citation omitted)).  The court refrains from deciding whether the words are copyrightable at this stage, however, as such a determination would be premature without additional context, and the determination is not dispositive.

The remaining two excerpts, in Rows 5 and 6, provide further evidence from which the court can infer similarities between the two guides.  Rows 5 and 6 employ the same structure, as they both begin with an action verb in bold and capitalized lettering, to guide the instructors on what to do or say.  The highlighted portions are also similar in substance, and they include some of the same words.  Specifically, in Row 5 each guide prompts the instructor to ask the students about their "biggest challenge" when teaching or facilitating, and then to "comment appropriately" on the students' responses.  The excerpts in Row 6 both incorporate a question pertaining to "skills" that are important in the learning environment.

ATD argues, again, that these rows present fragmentary words and phrases that are not worthy of copyright protection.  The court finds, as explained above, that these arguments, while not wholly without merit, do not warrant a denial of a motion to amend, and should be addressed when more context is available at summary judgment or at trial.

In sum, InSync alleges that ATD had access to its Course Materials, which were the product of years of InSync's own efforts; that ATD developed its own competing offerings from

scratch within eight or nine months of acquiring the Course Materials; and that ATD's materials "bear probative and substantial similarity to InSync's Course Materials through the nearly identical expression of prompts and directives to course facilitators and producers."  InSync also presents two similar course descriptions and a Comparison Chart with six excerpts from the parties' facilitator guides, some of which contain substantive and organizational similarities.

When viewed in the light most favorable to InSync, the allegations, course descriptions, and portions of the Comparison Chart adequately plead factual copying and substantial similarity, as required to state a copyright infringement claim.  See Cortés-Ramos v. Martin-Morales, 956 F.3d 36, 42 (1st Cir. 2020) (finding that the plaintiff met his "burden of pleading both indirect actual copying and substantial similarity" by alleging facts that gave rise to the "reasonable inference that [the defendant] had access" to the protected material, and by alleging that the protected work and the allegedly infringing work were "almost identical"); FragranceNet.com, Inc. v. FragranceX.com, Inc., 679 F. Supp. 2d 312, 315, 325 (E.D.N.Y. 2010) (finding that the plaintiff "alleged sufficient facts to support its claim for copyright infringement" by alleging that the defendant copied more than 900 of the plaintiff's copyrighted images from its website, which contained "original elements," including "arrangement, lighting, [and] use of shadow," and by attaching to its complaint screenshots of the copyrighted images and the offending images).  The court accordingly grants the motion to amend as to this claim, finding that InSync's amendments are not futile.

## B.  Breach of contract (Count 3)

InSync alleges that ATD breached § 1.4 of the License Agreement, which provides that ATD "may not during the Term of this Agreement or anytime thereafter use or rely upon the Intellectual Property in order to directly or indirectly develop, deliver, market or offer any

service that is similar to or which competes with the InSync Programs or [InSync's] then-current

offerings."  The contract defines Intellectual Property as InSync's "copyrights, trademarks,

patents, trade secrets, know-how and other rights in and to . . . the written, visual, audio, video

and other content comprising and/or relating to the InSync Programs . . . ."[18]  InSync further

alleges that this definition of Intellectual Property "necessarily includes" the Course Materials.

ATD argues that the amendments to the breach of contract claim are futile for the same

reasons that the amendments to the copyright claim are--InSync's complaint contains only

speculative and conclusory allegations that ATD copied or used InSync's Course Materials to

"directly or indirectly develop, deliver, market or offer" competing programs.  The court

disagrees.

"Breach of contract occurs when a party fails to perform any promise that 'forms the

whole or part of a contract' without legal excuse."  Steele v. Deutsche Bank Nat'l Trust Co., No.

14-cv-350-JD, 2014 U.S. Dist. LEXIS 175800, at *5-6 (D.N.H. Dec. 17, 2014) (DiClerico, J.)

(quoting Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 668 (2013)).  As an initial matter, to

the extent that ATD is arguing that the elements of a copyright infringement claim must be

imputed to InSync's breach of contract claim--and the two claims must be analyzed in the same

manner--ATD is mistaken.  InSync's contract claim should be analyzed independently from the

copyright infringement claim because § 1.4 of the License Agreement can "plausibly be read" to

prohibit a broader set of activity than copyright infringement.  Young v. Wells Fargo Bank,

N.A., 717 F.3d 224, 235-36 (1st Cir. 2013) (noting that, at the motion to dismiss stage, a court

should resolve any contractual ambiguities in the plaintiff's favor).  Specifically, § 1.4 prohibits

not just copying, but the "use or reli[ance] upon" InSync's Intellectual Property, and it defines

---

[18] License Agreement (doc. no. 24-3) at § 1.1.

Intellectual Property as more than just "copyrights," but also "trademarks, patents, trade secrets, know-how and other rights in and to" InSync's content.

During oral argument, ATD stated that, even if § 1.4 prohibits a broader set of activities than just copyright infringement, InSync does not specifically allege that the Course Materials fall under another category of Intellectual Property, aside from "copyrights." Thus, according to ATD, InSync does not allege that ATD engaged in any other conduct barred under § 1.4, aside from copyright infringement. The court's reading of the complaint differs from ATD's reading. InSync alleges that its definition of Intellectual Property "necessarily includes" the Course Materials. With this statement, InSync adequately alleges that the Course Materials constitute other forms of Intellectual Property, such as "know-how." InSync thereby asserts a breach of contract claim that is not necessarily duplicative of, and may fail or succeed independently from, its copyright infringement claim.

Turning to InSync's allegations in support of the breach of contract claim, InSync claims that prior to 2020, ATD focused on in-person professional development offerings. ATD gained access to the Course Materials beginning in October 2020, upon execution of the License Agreement. Some months later, on March 29, 2021, ATD notified InSync of its intention to terminate the License Agreement effective June 30, 2021, and informed InSync that it planned to offer its own "competitive virtual and online training programs" after the Agreement's termination. Finally, according to InSync, ATD's new programs "are not the sort of content that a company could create from scratch in less than a year." Putting these allegations together, taking them as true, and drawing all reasonable inferences in InSync's favor, the court can infer that ATD was able to shift its focus from in-person to virtual programs unusually rapidly by

using (at least in part) InSync's Course Materials to develop the competing offerings, thereby breaching § 1.4 of the Agreement.  InSync's motion to amend this claim is granted.

### C.  Fraudulent misrepresentation (Count 4)

In its fraudulent misrepresentation claim, InSync alleges that ATD entered into the License Agreement "with the intent of accessing and exploiting the Course Materials for its own commercial purposes," but it "represented to InSync that it was entering the License Agreement in good faith" in order to induce InSync to license its Course Materials to ATD.[19]  ATD argues that the motion to amend should be denied as to this claim because InSync provides no nonspeculative, nonconclusory allegations from which scienter can be reasonably inferred.  The court agrees.

Under New Hampshire law, "[t]he tort of intentional misrepresentation, or fraud, must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation."  Tessier v. Rockefeller, 162 N.H. 324, 332 (2011) (quoting Patch v. Arsenault, 139 N.H. 313, 319 (1995)).  "The procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure 9(b)."  Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 427 (1st Cir. 2007) (internal quotation omitted).  Under Rule 9(b), a party alleging fraud must "identify[] the basis for inferring scienter."  N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009).  When applying this standard, "courts have uniformly held inadequate a complaint's general averment of the defendant's knowledge of material falsity, unless the

---

[19] Pl.'s Amended Compl. (doc. no 24-1) at ¶¶ 57-58, 60.

complaint <u>also</u> sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading."  <u>Id.</u> (emphasis in original) (internal quotation omitted).

In alleging scienter, InSync claims, in a conclusory fashion, that ATD "entered into or continued under the License Agreement with the intent of accessing and exploiting the Course Materials for its own commercial purposes[,]" and that "[u]pon information and belief, ATD knew of, should have known of or had conscious indifference to, its bad faith intended use of the Course Materials either when it entered into the License Agreement or shortly thereafter."[20] InSync does not allege other specific facts from which the court can infer ATD's knowledge of its fraudulent misrepresentation at or near the time of signing the License Agreement.

InSync states, without much explanation, that ATD's fraudulent intent during this timeframe can be inferred from its admission in March 2021 that it intended to provide competing courses, and its subsequent launch of the courses on July 1, 2021.[21]  While the court is willing to infer, based on the nature of ATD's competing offerings and the speed with which ATD produced them, that ATD decided to use InSync's Course Materials in the development of its own offerings <u>at some point</u> between entering into and informing InSync of its intention to terminate the License Agreement, the court does not find that InSync alleges "specific facts" supporting the inference that ATD made this decision prior to, or just after, the execution of the License Agreement, as required to sustain this fraud claim.  <u>Cardinale</u>, 567 F.3d at 13.  InSync's motion to amend the complaint as to this claim is denied.

---

[20] <u>Id.</u> at ¶¶ 58-59.

[21] <u>See</u> Pl.'s Reply (doc. no. 35) at 22.

### D. Unfair competition (Count 2)

InSync asserts an unfair competition claim under New Hampshire's Consumer Protection Act. The Act makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA § 358-A:2. ATD asserts that the claim is based on the same alleged misconduct as the copyright infringement claim, aside from a conclusory allegation regarding false pretense, and should thus be dismissed as preempted by the Copyright Act. The court concludes otherwise.

The Copyright Act's preemption provision "precludes enforcement of any state cause of action which is equivalent in substance to a federal copyright infringement claim." Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1164 (1st Cir. 1994) (internal citation omitted), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010). The First Circuit Court of Appeals has explained that

> [c]ourts have developed a functional test to assess the question of equivalence. If a state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display, then the state cause of action is qualitatively different from, and not subsumed within, a copyright infringement claim and federal law will not preempt the state action.

Id. (quoting Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 847 (10th Cir. 1993)). But "a cause of action will not be saved from preemption merely by elements such as awareness, intent, or commercial immorality, which alter the action's scope but not its nature." Rubin v. Brooks/Cole Pub. Co., 836 F. Supp. 909, 923 (D. Mass. 1993) (internal quotation omitted) (citing cases).

InSync's unfair competition claim primarily rests on three allegations: (i) "ATD entered into or continues with the License agreement under false pretense," specifically to use InSync's Course Materials to develop its own competing offerings; (ii) ATD continued to use the Course

Materials after the termination of the License Agreement, without InSync's consent; and (iii) ATD continues to infringe on InSync's copyright even after having actual notice that InSync has exclusive ownership in the copyrighted Course Materials.  The second and third allegations allege the same misconduct underlying the copyright infringement claim—the copying of InSync's Course Materials.

The first allegation, however, presents an additional element not included in the copyright infringement claim--that ATD entered into or remained party to the License Agreement in order to use the Course Materials for its own commercial purposes.  This allegation can be broken up into two parts.  First, the allegation that ATD entered into the License Agreement under false pretense is a replication of InSync's fraudulent misrepresentation claim.  Thus, it is subject to the heightened Rule 9(b) pleading standard, and it fails to satisfy this standard for the reasons stated in the previous Section.  See Micronics Filtration Holdings, Inc. v. Miller, No. 18-CV-303-JL, 2018 WL 4845749, at *6 (D.N.H. Oct. 4, 2018) (Rule 9(b) "applies to allegations supporting a [New Hampshire Consumer Protection Act] claim that sound in fraud" (internal citation omitted)).

This leaves InSync's allegation that ATD "continues with" the License Agreement under false pretense.  This allegation does not sound in fraud, as it lacks the "traditional elements of a fraud action[,]" such as "an intent on the part of the defendant that the [false] statement . . . should be acted upon by the plaintiff" and "the detrimental reliance upon the false representation . . . by the person claiming to have been deceived."  5A  Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1297 (4th ed., 2021 update).  Thus, the allegation is subject to the general federal pleading standard.  InSync alleges that ATD focused on in-person offerings prior to 2020; obtained access to InSync's Course Materials under the License

21

Agreement in October 2020; announced its plan to offer competing courses a few months later, in March 2021; and developed the courses rapidly, while in possession of the Course Materials. This "factual content . . . allows the court to draw the reasonable inference" that ATD decided to use the Course Materials to develop its own, competing offerings at some point between entering into and terminating the License Agreement, and thereby remained party to the Agreement under false pretense.  Martinez, 792 F.3d at 179 (1st Cir. 2015).

      With this allegation, InSync extends the state law claim beyond the activity prohibited under the Copyright Act (unauthorized reproduction and similar acts), to include the employment of unfair or deceptive practices to maintain access to the copyrighted material.  This additional element takes the state law claim outside of the preemption provision's reach.  See Patricia Kennedy & Co. v. Zam-Cul Enterprises, Inc., 830 F. Supp. 53, 57 (D. Mass. 1993) (finding that the plaintiff's state law claim was not preempted because it was "not limited to a mere charge of use or copying of the [protected material] . . . .  [The plaintiff] also alleges that the defendants' acquisition of the logo was accomplished by unfair or deceptive means."); Rubin v. Brooks/Cole Pub. Co., 836 F. Supp. 909, 924 (D. Mass. 1993) (a state law claim based on the defendant's reproduction of the plaintiff's protected work without permission and continued reproduction after the plaintiff's objections would be preempted, as a claim based on "these acts asserts rights subsumed within an action for copyright infringement," but a state law claim based on the defendant's "improper representation of permission" was not preempted because it was "based . . . upon an element of misrepresentation and deceit beyond mere reproduction" (internal citations omitted)); Brignoli v. Balch Hardy & Scheinman, Inc., 645 F. Supp. 1201, 1205 (S.D.N.Y. 1986) (finding that four of the plaintiffs' claims were not preempted by the Copyright Act because they were "essentially breach of contract claims that involve an element beyond unauthorized

reproduction and use—a promise to pay plaintiff for use of his product" (internal citations omitted)). The court grants InSync's motion to amend with respect to this claim.

IV.   **Conclusion**

For the reasons stated above, InSync's motion to amend[22] is GRANTED as to copyright infringement, breach of contract, and unfair competition claims, and DENIED as to its fraudulent misrepresentation claim.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: April 13, 2022

cc:   Lauren Pritchard, Esq.
      Edward J. Sackman, Esq.
      John R. Bauer, Esq.
      John Mark Dickison, Esq.

---

[22] Doc. no. 24.